**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
BARRY DRAYER,

                            Petitioner,

                                                          **MEMORANDUM OF**
              -against-                                   **DECISION AND ORDER**
                                                          11-CV-753 (ADS)
UNITED STATES OF AMERICA,

                            Respondent.
-------------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Barry Drayer, <u>Pro</u> <u>Se</u>**
24323-038
FCI Otisville Prison Camp
PO Box 1000
Otisville, NY 10963

**United States Attorney for the Eastern District of New York**
*Attorneys for the Respondent*
271 Cadman Plaza East
Brooklyn, NY 11201
    By:  Steven Lawrence Tiscione, Assistant United States Attorney

**SPATT, District Judge.**

        On February 11, 2011, the Petitioner Barry Drayer (the "Petitioner"), <u>pro se</u>, filed this

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255.  The Petitioner, who is

presently incarcerated and serving a sentence of 138 months followed by supervised release for a

term of three years, claims that his trial counsel were ineffective.  He also suggests that his

appellate counsel was similarly ineffective for their failure to raise his ineffective assistance of

counsel arguments on his first direct appeal.  In addition, the Petitioner has filed two letter

motions seeking to conduct discovery and to amend his petition.

        For the reasons that follow, the letter motions and the petition are denied.

# I. BACKGROUND

## A.  The Lending Practices of RW Professional Leasing Services, Inc.

From 1991 through mid-2002, the Petitioner led a complex fraud scheme through RW Professional Leasing Services, Inc. ("PLS"), which was a company he controlled.  In this regard, PLS provided financing to medical professionals who wanted to purchase new medical equipment or obtain funding in connection with maintaining a medical practice.  PLS operated out of two offices, one in Island Park, New York, and the other in Massachusetts. The Massachusetts office handled collections, credit, customer service, and all dealings with lenders and funding sources.  The Petitioner managed the Massachusetts office of PLS on a day-to-day basis, and also made decisions for the company as a whole.  He was officially the Vice-President and a Director, but he called himself the chief executive officer of the company.

However, PLS did not originate the funding for the loans it issued, but rather acted as the financing broker.  In this capacity, PLS arranged to obtain financing for medical professionals from lending institutions, and also serviced the loans after they were issued.  PLS typically engaged in three types of transactions: (1) equipment leasing transactions, in which PLS would directly buy equipment chosen by a medical professions and lease the equipment back to the doctor; (2) sale-leaseback transactions, in which a doctor would sell existing equipment to PLS and PLS would lease the same equipment back to the doctor; and (3) working capital loans, in which money was lent to the doctor without any specific collateral, other than a blanket lien against the practice.

PLS had relationships with a variety of financial companies to either provide capital loans directly to the borrower, or lend PLS funds for the purpose of entering into leases with

medical providers. These funding sources included federally-insured community banks, through a broker known as Crawford & Sons, and non-bank lenders such as AT & T Capital and First Sierra.

The federally-insured community banks, such as Alliance Bank, Northwest Bank, and People's Bank, engaged in portfolio lending, in which the bank would lend money to PLS based on an agreement that included a portfolio or group of equipment leases. Under the terms of the agreements, PLS typically serviced the loans that were made to the medical providers. If an individual borrower, such as a doctor, prepaid the loan by paying the balance of the loan early, PLS was required to either remit those proceeds to the funding institution or substitute the paid off lease with a new lease of equal value. Similarly, if a borrower defaulted or went bankrupt, PLS was required to either pay the bank or substitute another transaction.

The non-bank lenders, First Sierra and AT & T Capital, serviced their own loans. First Sierra and AT & T used a "lock-box," in which invoices under the PLS name were sent to the doctors, and the doctors wrote checks payable to PLS, and PLS forwarded the checks to a mailbox under the lender's control. If a doctor's payment was late, PLS had the obligation to collect money from the doctor. If the borrower defaulted, PLS was responsible to pay the full amount of the loan to the lender. If a doctor went bankrupt, PLS was required to notify the lender and pay the loan in full or "substitute" it, that is, PLS would finance another loan with its own money and then assign the stream of payments to the lender.

Within this framework, under the direction of the Petitioner, PLS devised a number of schemes to defraud the funding institutions by concealing the nature of the collateral, the distribution of the loan proceeds, and the payments made on the loans. These schemes included, but were not limited to, the following: (1) the use of phony and forged financial instruments;

(2) the "Mailbox Etc." and "Pay Ahead" scheme; (3) the multiple lending scheme; (4) the

Riteway and GHT sham companies; (5) the Hospitality Services of Middle Tennessee ("HSMT")

scheme; (6) the Carefree and MedPro conspiracy; and (7) the concealment of records from

auditors.  These schemes are discussed in more detail below.  Of note, the Petitioner made

millions of dollars in commissions from the scheme, while the lenders lost tens of millions of

dollars.  In 2002, the scheme collapsed, when the Petitioner and his co-defendants were arrested.

**B. The Fraudulent Schemes and the Evidence at Trial**

**1. The Use of Phony and Forged Financial Instruments**

One of the first schemes devised by PLS was developed to trick the lending institutions

into accepting payments from PLS on behalf of borrowers.  Under the "lock-box" system, which

PLS arranged with the non-bank lenders, the borrower was required to send payments directly to

the bank.  First Sierra accepted payments from PLS on behalf of borrowers from time to time,

but would require proof that a doctor had actually paid PLS before accepting the payment

directly from PLS.  To fulfill this requirement, PLS created altered or forged financial

instruments purporting to show that borrowers had paid PLS.  This scheme prevented the lender

from learning that the borrower had stopped making payments for one reason or another, which

would have required PLS to remit the remaining balance of the loan.

The phony check scheme was offered to the jury through the testimony of the actual

employees who forged the phony checks and documents. Frank Zambaras testified that he

scanned and altered checks through the use of a computer at the request of the Petitioner's

brother, Roger Drayer.  Zambaras altered the amount on the checks, the dates on the checks and

check numbers by scanning the checks into a computer and using digital imaging editing

software to make the alterations.  Roger Drayer supplied Zambaras with the checks to be altered

with a note affixed to them as to what modifications were needed on the checks. Roger Drayer told Zambaras that there was nothing wrong with the alterations because the checks were not being presented for payment, but only for false proof that the doctors had paid PLS. When Zambaras was unwilling to continue forging the checks, he showed Roger Drayer how to scan and modify the checks on the computer using Corel Photo Paint.

PLS also created phony telechecks, which are documents that show proof of payment by telephone. These phony documents were used for the same purpose as the phony checks. Jennifer Tarantino, Roger Drayer's daughter and the Petitioner's niece, testified that she created these phony documents. PLS generated between 1,000 and 1,500 of the telechecks to submit to the banks as phony evidence of proof of payment. Tarantino testified that, pursuant to the Petitioner's written instructions, she and other employees in New York created unauthorized telechecks to make it look like the doctors had paid their monthly bill to PLS on outstanding loans, when in fact they had not. Tarantino stated that she participated in this fraudulent conduct daily for a total period of two years.

Adam Drayer, Tarantino's brother and Roger Drayer's son, testified that he created false Western Union receipts along with employee Zambaras, for the same purpose of providing the banks with phony proof that a doctor had submitted payment to PLS.

All of these witnesses testified that they created these false instruments at the direction of the Petitioner. According to Roger Drayer: "[The Petitioner] had called me one day and asked me to go to Frank [Zambaras] and ask Frank if we could take a check that was already there, and alter the date or the check number or the amount on it. Not for the purpose of cashing it, but for the purpose of sending it as proof to request a payment that was made." (Tr. 1392–93). Roger Drayer also testified that he acted at the Petitioner's direction when he instructed employees of

5

the New York office to fax lists of accounts requiring phony telechecks to be created, and when he diversified the scheme to include phony Western Union money grams.

### 2. The "Mailbox Etc." and "Pay Ahead" Scheme

A second scheme involved the use of accounts at Mailbox Etc., to intercept invoices sent by First Sierra and AT & T intended for PLS borrowers.  PLS used this scheme for borrowers who had gone bankrupt or prepaid the amount of the loan.  Instead of notifying the financial institution of the bankruptcy, or remitting the prepayment as required, PLS concealed the fact and kept the funds for its own use.  This became more prevalent toward the later years of the scheme.  PLS used these proceeds for operating expenses and for making payments on defaulted loans.

Lynn Walker, a former PLS employee, was responsible for customer service and collections at PLS.  As part of her collection duties, Walker would contact delinquent doctors and receive payment checks.  Walker testified that she was supposed to record any payments that came directly to PLS, but the Petitioner instructed her that she was not to record any large check received on the First Sierra account.  Instead, the Petitioner instructed Walker to send those checks to the PLS New York office and have Rochelle Besser call him regarding the check. When doctors called to prepay loans, the Petitioner instructed Walker to have the doctor send the payoff check to the PLS Massachusetts office rather than the bank. When PLS kept the money on prepaid loans, it would make monthly payments to the funding source on those accounts.

To conceal the fraud, PLS provided First Sierra or AT & T with a change of address form to redirect the borrower's mail to a Mailboxes Etc. maildrop account in the same geographic area as the borrower.  This diversion prevented the doctor from knowing that the loan had not been

paid to the financial institution, and permitted PLS to make timely payments to the bank, with the use of the phony payment instruments.

This same scheme was used with the federally insured banks. Besser testified that Crawford & Sons' pension and profit sharing plan invested in certain PLS loans. In some cases, the pension plan would provide a bridge loan until particular leases could be funded through an FDIC bank, and in other cases, the pension fund directly invested or lent money to fund such leases. Al Crawford, the broker for the banks, called Besser in March 2002 about one of the loans funded by the pension fund. Crawford was angry after learning that PLS had received a prepayment of over $300,000 on a loan to Dr. Ojeager, and had failed to remit the proceeds to the Crawford pension fund. In addition, Besser prepared and authenticated a summary chart of bank loan files and related PLS pay histories. The summary showed that the loan files included fourteen bankruptcies, and twenty-eight prepayments, where PLS kept the money instead of sending it back to the bank.

Tarantino testified that she managed the Mailboxes Etc. accounts. There were approximately 100–200 Mailbox Etc. accounts. She stated that she opened accounts at Mailboxes Etc. to "receive invoices that were sent from the bank to the doctor." (Tr. 1104). An employee from Massachusetts, Wendy Cutillo, typically sent instructions from the Petitioner with the information necessary to change the doctor's address and open a mailbox account. (Tr. 1109). Other exhibits were introduced by the government showing faxes between Roger Drayer and the Petitioner concerning setting up the Mailboxes Etc. accounts.

Eventually, PLS closed the Mailboxes Etc. accounts because the Petitioner learned that if an account was paid ahead, then First Sierra would not generate an invoice, because no balance was due. Thus, the mail-drop scheme was replaced with this simpler "pay ahead" scheme.

### 3. The Multiple Lending Scheme

In this scheme, PLS submitted a legitimate loan application to several different lenders, without the borrowers consent.  Upon approval, PLS kept the funds from some of the multiple lending, without remitting the proceeds to the applicant.  PLS fraudulently retained the other loans for its own use.  The government introduced a summary chart showing thirty-two loans where the bank funded PLS, but PLS kept the money rather than forwarding it to the borrower.

Dr. Eve Ann James–Wilson, a dentist, testified as a victim of this multiple lending scheme. Dr. James–Wilson applied for financing from PLS in 2001, seeking a "consolidation loan" to cover credit card debts and other loans she had amassed from the purchase of an existing dental practice and dental equipment.  (Tr. 383).  Dr. James–Wilson executed loan documents for two $50,000 loans with PLS for existing equipment.  However, she did not receive any of the $100,000 promised.  She contacted PLS and spoke to the Petitioner, who said there was a technical difficulty, but that her money should be deposited in her account within the next week.  Dr. James–Wilson never received any money from PLS, but received bills for two loans by Alliance Bank and Bank of Taney County.  She subsequently received two letters from PLS to Bank of Taney County and Alliance Bank, stating that Dr. James–Wilson's loans "have not been funded" and further stating that PLS remained liable for the outstanding obligations.

### 4. The Riteway and GHT Sham Companies

A fourth scheme involved disguising the character of the loans.  PLS provided lease agreements for both the purchase of new equipment and promissory notes for working capital loans.  However, funding for working capital loans was more difficult to obtain, and typically these loans were capped at $50,000. On the other hand, lease agreements for new equipment were favored by the bank and the loans could be for as much as $300,000, depending on the

price of the equipment. To capitalize on this distinction, PLS created several schemes to fraudulently disguise working capital loans as ones secured by new equipment.

Riteway Health Services ("Riteway") was a sham company created at the direction of the Petitioner for the purpose of obtaining new equipment leases. Riteway's sole purpose was to issue false invoices for new equipment, in instances where the doctor already owned the equipment, to make it appear as if the equipment being leased was new. PLS created purchase invoices under Riteway's name, and then submitted the invoices to the funding sources so that any loan could be approved as one for new equipment.

Susan Cottrell, an employee at PLS, testified about the Riteway invoices. To Cottrell's knowledge, Riteway did not even exist except on paper, and Riteway did not sell any equipment to PLS that she was aware of. She stated that she prepared Riteway invoices by using a template and copying a list of equipment off of a schedule. Although Cottrell filled in the invoices by inserting the doctor's address in the "ship to" box, Cottrell never arranged for any equipment to be shipped, and to her knowledge, PLS never arranged for any equipment to be shipped from PLS. Significantly, Riteway invoices were never sent to the doctors.

The Petitioner provided Cottrell with the amount to enter on the Riteway invoice and it always equaled the amount of the loan. The Petitioner instructed Cottrell how to prepare Riteway invoices and informed her which deals needed to have Riteway invoices prepared. The Petitioner told Cottrell not to send Riteway invoices to doctors. Cottrell knew it was wrong to send the Riteway invoices to the funding sources, but she testified that she did because she was instructed to do so by the Petitioner.

Tarantino was the nominal President of Riteway, but the company had no employees, no equipment, and no money. The false invoices it issued were created in Massachusetts. Further,

PLS created checks from PLS to Riteway to make it appear than the invoices had been paid. Copies of these checks were then sent to First Sierra or AT & T, as proof of payment. After submitting the false payments, PLS voided the checks.

Cottrell testified that she conducted verbal audits for PLS, the ostensible purpose of which was to make sure the doctor understood the lease agreement, and that he received the new equipment. These audits were documented and submitted to the funding institutions as part of the loan application. However, Cottrell was directed by the Plaintiff to avoid questions about the equipment on Riteway deals because the equipment was not new, and the doctors already had it in their offices.

GHT was another company formed in Tarantino's name. This company was formed to reduce PLS's tax liability by buying PLS losses or receivables that could no longer be collected at a discount. Roger Drayer developed this idea and discussed it with the Petitioner. The evidence showed that GHT was a fictitious entity. It did not spend any money to "buy" PLS' losses or any receivables, but PLS's financial statements falsely reflected that such transactions occurred.

### 5. The Hospitality Services of Middle Tennessee ("HSMT") Scheme

The use of fake invoices from Riteway was instrumental in the HSMT scam. The HSMT scam involved the funding of a fraudulent loan to a hotel under the false statement that it was a medical clinic. Riteway issued numerous fake invoices for new medical equipment to HSMT to support these loans. However, HSMT never applied for funding from PLS, and that it was a hotel, not a medical clinic.

Dr. Kodihalla Channabasappa, a cardiologist in Tennessee and a partner in HSMT, and Prabhakar Pallapothu, an investor in HSMT, both testified that HSMT was a hotel, and that it

was not in the medical business, nor was it authorized to operate a medical practice. Indeed, HSMT did not even borrow money from PLS. When shown loan documents purporting to show that HSMT had borrowed money from PLS, Dr. Channabasappa and Pallapothu stated that their signatures had been forged. Dr. Channabasappa further testified that HSMT received mail from banks regarding these unauthorized loans, and that he contacted the banks who directed him to the Petitioner. Dr. Channabasappa contacted the Petitioner, and the Petitioner was unable to explain why the loans were issued.

Cottrell testified that she arranged to have another company verify the equipment that was sold to HSMT. However, the company informed her that the location was a hotel, and that it could not get in to all of the rooms to check the equipment because they were occupied by guests. In fact, HSMT had no medical equipment. Cottrell also stated that to her knowledge, the Petitioner never informed First Sierra that HSMT was a hotel and not a medical clinic. Further, Cottrell was not aware of any other occasion in which PLS arranged financing for a hotel.

In sum, the evidence revealed that HSMT was a massive fraud. Records produced at trial showed that PLS arranged seventeen loans for HSMT in the total amount of $2,343,140.15. PLS received $2.3 million from banks, but only paid out $650,000 to HSMT.

### 6. The Carefree and MedPro Conspiracy

One of the Petitioner's co-defendant, Stephen Barker operated a scheme similar to the Riteway phony invoice plot. Barker controlled two companies based in California known as MedPro Equipment Co. ("MedPro"), and Carefree Financial Services ("Carefree"). Under the direction of Barker, Carefree acted as a broker for PLS, preparing and remitting loan applications to PLS for submission to the lending institutions. The government characterized MedPro as Barker's "Riteway," a sham corporation with the sole purpose of issuing false medical

11

equipment invoices to ensure that inappropriate lending applications would be approved. Carefree used the same types of documents as PLS and nearly all of Carefree deals sent to PLS had MedPro invoices indicating that the loan was secured with new medical or dental equipment.

Cottrell testified that she received the finalized loan documents from Carefree for PLS. Cottrell reviewed the documents and forwarded the applications to Crawford & Sons, who would forward them to the community banks. On First Sierra deals, Cottrell would send the documents to the PLS New York office, which would then forward them to First Sierra. Cottrell stated that MedPro invoices often falsely purported to show equipment being purchased by PLS from MedPro, and shipped to doctors. PLS paid out loans by sending a wire transfer to a MedPro bank account and commissions to Carefree by a separate check. These commissions were approved by the Petitioner. In total, hundreds of Carefree deals were funded by First Sierra.

Cottrell conducted verbal audits on MedPro deals similar to the ones for Riteway, using the same audit sheet. On these verbal audits, Barker called the doctor and arranged for a conference call between the three parties. As with the Riteway deals, Cottrell did not ask any questions regarding equipment because the doctors already had the equipment and it was not new equipment. Cottrell stated that she conducted hundreds of verbal audits with Barker on MedPro deals. In those hundreds of verbal audits, neither Cottrell nor Barker ever mentioned the name MedPro.

In addition, Cottrell testified that she prepared delivery and acceptance receipts for loan packages. These receipts purported to certify that equipment involved in a particular loan had been "delivered, inspected, installed, is in good working condition, and accepted by the undersigned [doctor] as satisfactory." (Tr. 2411; Gov't Ex. Ab–5C). Cottrell prepared the receipts on Riteway deals and Carefree prepared the delivery and acceptance receipts on MedPro

deals. (Tr. 2410–411). The receipts were included in both Riteway and MedPro applications to the banks at the direction of the Petitioner. Cottrell believed that the receipts were not truthful representations because the equipment on the Riteway and MedPro deals were not new, and thus had not been delivered, inspected, and accepted by the doctors.

Tallie Jo Allen, who worked at Carefree as an administrative assistant from June of 1999 through April of 2002, prepared loan documents and sent them to doctors for execution. Allen testified that 100 percent of Carefree's business was done with PLS. Allen explained that she would send out blank applications for the doctors' signatures and if Carefree did not receive an equipment list from the doctor, Carefree would fill in the list after the doctor had signed the blank document and sent it back to Carefree. Allen did not know whether the equipment list provided by the doctor listed new equipment or equipment already owned by the doctor, but all of the schedules listed equipment under the heading "new equipment description." Allen was never instructed to change the list to included used equipment.

Allen also prepared MedPro invoices and answered a phone line for MedPro, even though she was not an employee of MedPro, and never met any employees of MedPro. Allen was not aware of any address, building, or other physical location for MedPro other than the P.O. Box listed on the invoice. She never took any customer orders for equipment and was not aware of anyone else in the office taking equipment orders from customers for MedPro. There was never any equipment stored in the office and Allen never saw any reason to believe that MedPro had a warehouse where equipment was kept.

MedPro invoices were always billed to PLS, and never to another company. Allen created approximately 200 MedPro invoices, which were sent to PLS along with the rest of the loan paperwork. Barker instructed Allen how to prepare the MedPro invoices. The MedPro

invoice was created by inserting the equipment listed by the doctor in the loan application into a template. The template had "Professional Leasing" inserted as the standard "sold to" company on every invoice. The total amount for the invoice was provided to Allen by Stephen, Evan or Bryn Barker, and the value on the invoice always equaled the amount of the loan. Allen added the doctor's address in the "ship to" box on the MedPro invoices, but never arranged for any equipment to be shipped from MedPro to the doctor, nor was she aware of any equipment ever being shipped. Sometimes Allen would receive invoices from other vendors showing that the doctors had purchased equipment from another vendor and not MedPro. However, this equipment that was purchased from other vendors was still inserted on the MedPro invoices as new equipment sold by MedPro.

Allen testified that every deal involving equipment contained a MedPro invoice. If there were mistakes in an invoice, Allen would simply correct it and send a new invoice to PLS without contacting anyone from MedPro. If she ever had any questions regarding MedPro, she would ask Barker. Allen never received a call from a doctor asking about MedPro and never mentioned the name MedPro to any doctors. MedPro invoices were not signed by doctors and were never sent to the doctors. In fact, she was instructed by Barker to "say that we didn't have the equipment." (Tr. 1050).

Several doctors who applied for financing with Carefree testified at the trial. Doctor Tim Silegy, an oral and maxillofacial surgeon, testified that in 2000 he applied for a working capital loan in the amount of $50,000 and an additional $25,000 loan from Carefree Financial. After receiving the proceeds for the loans, Dr. Silegy canceled the $25,000 loan and sent a check for $25,000 to PLS. Sometime later, Dr. Silegy received a billing inquiry from Alliance Bank requesting payment on the cancelled loan. When showed a MedPro invoice, for new equipment

attached to the Alliance Bank loan, Dr. Silegy stated that he had not received this invoice and that the listed equipment was not new, but had already been in his office at the time of the loan.

Dr. Anita Srinivasa, an internist, testified that she applied for financing from Carefree Financial in 2001 to purchase an existing medical practice in Thousand Oaks California. Dr. Srinivasa dealt with Barker at Carefree and arranged for two loans, a $50,000 working capital loan and a $55,000 equipment loan. According to Dr. Srinivasa, the $105,000 in borrowed funds was for the purchase of an existing medical practice and old equipment that was already present in the office of the practice. Dr. Srinivasa testified that she received the $50,000 for the working capital loan, but never received the proceeds for the $55,000 equipment loan. Despite having never received the proceeds from the loan, Dr. Srinivasa received invoices from Crown Bank Leasing seeking payment on the equipment loan. When showed a MedPro invoice, from the Crown Bank loan that Dr. Srinivasa was billed for, but had never received, Dr. Srinivasa stated that she had not received this invoice in connection with her loan. She testified that the invoice was false because she did not purchase any new equipment from MedPro as part of the deal, and the equipment listed on the invoice was existing equipment in the office that she was purchasing, not new medical equipment.

### 7. The Concealment of Records from Auditors

Finally, the government adduced evidence that the Petitioner attempted to conceal the fraudulent schemes from the banks. In July of 2001, Zambaras testified that he was present during a meeting with representatives from First Sierra at the New York offices of PLS in which First Sierra stated its intention to conduct a review of the accounts at PLS. Prior to the meeting, Zambaras stated that he was informed that Roger Drayer had prepared "an additional set of records for this visit for audit." (Tr. 217–18). Zambaras was told that if he was "asked to pull up

any physicians lease accounts, rather than going into the normal screens," Zambaras should "go into a duplicate set of records and present what I assume[d] was altered information." (Tr. 217–18). Zambaras examined the duplicated database and found that it varied from the company's actual records in that the duplicated records contained payments that had not been made and gave the impression that delinquent accounts were in fact current. When Zambaras was asked to show First Sierra representatives account records for specific doctors, Zambaras ignored the instructions of Roger Drayer and provided the original, unmodified information. Shortly after the audit, First Sierra terminated their relationship with PLS and from that time, PLS appeared to have a difficult time funding new loans.

## II. DISCUSSION

### A.  Legal Standard Under 28 U.S.C. § 2255

Relief is available under 28 U.S.C. § 2255 "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 37, 30 (2d Cir. 2000) (internal quotations and citations marks omitted). The Court's discretion to grant such relief is to be exercised sparingly, for such applications "are in 'tension with society's strong interest in the finality of criminal convictions.'" Elize v. United States, No. 02-CV-1350 (NGG), 2008 WL 4425286, at *5 (E.D.N.Y. Sept.30, 2008) (NGG) (internal citations omitted); see also Brecht v. Abrahamson, 507 U.S. 619, 633–34, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) ("the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society

has grievously wronged and for whom belated liberation is little enough compensation")
(internal quotations and citations omitted).

Further, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on
direct review, the claim may be raised in habeas only if the defendant can first demonstrate either
cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S.
614, 622, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (internal quotations omitted). However,
claims of ineffective assistance of counsel "may be brought in a collateral proceeding under
§ 2255 whether or not the petitioner could have raised the claim on direct appeal." Massaro v.
United States, 538 U.S. 500, 504, 123 S. Ct. 1690, 155 L.Ed.2d 714 (2003).

**B. Ineffective Assistance of Counsel Generally**

A claim of ineffective assistance of counsel can be sustained only if counsel's
representation fell below an objective standard of reasonableness and there is a reasonable
probability that absent counsel's errors the outcome of the proceedings would have been
different. Strickland v. Washington, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 80 L. Ed. 2d 674
(1984); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998). Assuming counsel is prepared with
the relevant facts and appropriate legal standards, strategic decisions regarding the challenging of
evidence and witnesses cannot be second-guessed in an effort to support an ineffective assistance
of counsel claim. See United States v. DiPaolo, 804 F.2d 225, 234 (2d Cir.1986); Gonzalez v.
United States, 337 F. Supp. 2d 419, 423 (E.D.N.Y. 2004). Rather, the "ultimate focus of
inquiry" is "whether . . . the result of the particular proceeding is unreliable because of a
breakdown in the adversarial process." Strickland, 466 U.S. at 696; see e.g., United States v.
Reiter, 897 F.2d 639, 645 (2d Cir.1990) (affirming rejection of the ineffective assistance of
counsel claim even though defense counsel's failure to move to suppress evidence, poor cross-

examination, and frequent lateness and absences fell below professionally reasonable standards, given the overwhelming evidence of the defendant's guilt).

## C. As to the Letter Motions

By letter motions, the Petitioner seeks discovery and to amend his habeas petition. Concerning his discovery requests, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Lawson v. Smith, 10-CV-0477 JS, 2014 WL 2208186, at *12 (E.D.N.Y. May 27, 2014) (quoting Bracy v. Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796, 138 L. Ed. 2d 97 (1997)). However, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Id. (quoting Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 6(a)).

In this case, no good cause is present. Rather, the Petitioner seeks discovery material that is either irrelevant to his petition based on alleged ineffective assistance of counsel or else was already provided to him by the Government

As for the Petitioner's request to amend his habeas petition, the Court finds his application lacking. The amendments proposed by the Petitioner do not provide any new substantive claims, but instead offer unsubstantiated, irrelevant and illogical claims. Thus, because "the proposed amendment[s] would be futile[,] [they] must be denied." Hoover v. Senkowski, 00 CV 2662 (SJ), 2003 WL 21313726, at *3 (E.D.N.Y. May 24, 2003).

## D. As to the Petition

In this case, the Petitioner seeks habeas corpus relief from this Court because of the "at least 15 substantive failures in performance" that prevented him from receiving a fair trial. (Pet. Br., pg. 37.) However, the Court finds the Petitioner's arguments to be without merit.

First, to the extent the Petitioner questions his trial counsel's conduct with respect to cross-examination, the Court notes that "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F. 3d 724, 732 (2d Cir. 2002) (quoting Untied States v. Nersesian, 824, F.2d 1294, 1321 (2d Cir. 1987)). Here, "[the] Petitioner fails to overcome the presumption that his counsel's choices on cross-examination 'might be considered sound trial strategy.'" Moreau v. Ercole, 08-CV-LS45 ARR, 2011 WL 1741824, at *8 (E.D.N.Y. May 5, 2011) (quoting Strickland, 466 U.S. at 689).

Moreover, although the Petitioner asserts that his attorneys should have attempted to impeach the Government's witness based on minor inconsistencies in their testimonies, the trial record demonstrates that the Petitioner's counsel did significantly attempt to impeach the credibility of all of the Government's witnesses. In any event, "[the] Petitioner's claims that his trial counsel was ineffective because [they] failed to elicit minor discrepancies [in witnesses' testimony] . . . provide no basis for habeas relief[.]" Silva v. Miller, 04-CV-8013 KMK LMS, 2009 WL 4060946, at *22 (S.D.N.Y. Nov. 24, 2009).

The Court is also unpersuaded by the Petitioner's contention that the testimony of Internal Revenue Services (the "IRS") Special Agent Christopher King was somehow intended to "intentionally mislead the court and jury" since "the prosecutors and Agent King were aware that the command code to do a search for corporations in the IRS computer system ([the Integrated Data Retrieval System (the 'IDRS')]) was 'Uncler' not 'Namee.'" (Pet. Br., pg. 10.) This is because, based on the IRS's Internal Revenue Manual, "NAMEE" is, in fact, the correct command code for conducting a name and address search of the IDRS for tax return information related to a business entity.

The Petitioner also claims that his lawyers failed to raise the argument that none of the banks he defrauded actually lost money. However, this is simply not true. In fact, the Petitioner's counsel has raised this argument multiple times, including (1) in the Petitioner's initial Rule 29 motion at the close of the Government's case in chief; (2) in the Petitioner's post-trial motion for an acquittal or a new trial; (3) at the Petitioner's sentencing; (4) in the Petitioner's direct appeal and (5) at the Petitioner's re-sentencing.

The Court similarly finds the Petitioner's remaining arguments to be unavailing. For example, the Petitioner contends that his counsel should have called Joseph Conway as a witness, completely overlooking the fact that they were unable to do so because Conway had decided to assert his Fifth Amendment right. In addition, the Petitioner suggests that his counsel should have challenged allegations contained in the indictment, even though to do so would have been unnecessary, since the Court instructed the jury on several occasions that the indictment was not evidence and they could not consider it in their deliberations. Further, the Petitioner claims that his attorneys failed to present issues to the jury that arose during the pretrial proceedings without even attempting to demonstrate how such information would have been admissible evidence at trial.

In sum, the Petitioner failed to established that he received ineffective assistance of counsel and is, thus, entitled to habeas relief. However, the Court notes that even if the Petitioner had demonstrated some inadequacy on the part of his attorneys, his petition would still fail, given the overwhelming evidence of his guilt presented at trial. See Spataro v. United States, 10 CV 2668 SJ, 2013 WL 618426, at *5 (E.D.N.Y. Feb. 19, 2013) ("Counsel's inadequate representation may not be grounds for habeas relief where the conviction is supported by overwhelming evidence of guilt[.]") (citations omitted). Indeed, as outlined above, multiple

PLS employees, including relatives of the Petitioner, testified against the Petitioner and directly implicated the Petitioner as the architect of the fraudulent scheme. Moreover, as the Government points out, "[t]heir testimony was substantially corroborated by thousands of pages of documentary evidence, testimony from representatives of several financial institution victims and testimony from almost a dozen medical practitioners who were misled by the Petitioner and PLS." (Gov't Br., pg. 52.)

For these reasons, the Court finds the Petitioner's § 2255 habeas petition is without merit and it is dismissed in its entirety.

### III. CONCLUSION

The Petitioner's letter motions are denied; his § 2255 habeas petition is dismissed in its entirety; and the Clerk of the Court is instructed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
October 3, 2014

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge